**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

LOIS LAMA-WOLOBAH, as Personal
Representative of the Estate of H.W.,

        Plaintiff**,**

     v.

PAQUI, LLC, AMPLIFY SNACK BRANDS,
INC., THE HERSHEY COMPANY,
WALGREEN EASTERN CO., INC. d/b/a
Walgreen #03151, WALGREENS OF
MASSACHUSETTS, LLC, JAMES CONNOLLY,
and JANE DOE,

        Defendant.

Civ. No.: 4:24-cv-12016-MRG

## MEMORANDUM AND ORDER ON MOTIONS TO DISMISS [ECF Nos. 72 & 74]

**GUZMAN, J.**

Plaintiff Lois Lama-Wolobah ("Plaintiff" or "Lama-Wolobah") is the mother of minor H.W.[1] and sues Defendants in a wrongful death action involving the "One-Chip Challenge." Plaintiff Lama-Wolobah brings various claims under theories of negligence and product liability. [Am. Compl., ECF No. 65].

Before the Court are two motions to dismiss filed by Walgreen Eastern Co. Inc. and Walgreens of Massachusetts, LLC, (hereinafter the "Walgreens Defendants") and Defendants Paqui, LLC, Amplify Snack Brands Inc., and the Hershey Company (hereinafter the "Manufacturing Defendants") for failure to state a claim under Fed. R. Civ. P. 12(b)(6). [ECF Nos. 72, 74].

---

[1] The parties reference the decedent, H.W., by his full name throughout their pleadings. However, because H.W. was a minor, the Court will follow Fed. R. Civ. P. 5.2(a) which requires that court filings must redact the names of minor children to protect their privacy.

For the reasons stated below, the motion is **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

The following relevant facts are taken primarily from the allegations in Plaintiffs' Amended Complaint, [Am. Compl.], and are accepted as true for purposes of this motion. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014) (quoting A.G. ex rel. Maddox v. Elsevier, Inc., 734 F.3d 77, 80 (1st Cir. 2013)) (explaining that a reviewing court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)"). All plausible inferences are made in Plaintiffs' favor. Id.

### A.  Pacqui One-Chip Challenge

Defendants, The Hershey Company ("Hershey"), Amplify Snack Brands Inc. ("Amplify"), and Pacqui, LLC ("Pacqui") manufactured, distributed, marketed, and sold the "One Chip Challenge" ("OCC") chip, a tortilla chip seasoned with Carolina Reaper and Naga Viper Peppers, some of the spiciest peppers in the world. [ECF No. 65 ¶¶ 21, 54–58]. The Scoville scale is a tool for measuring the amount of capsaicin in hot peppers. [Id. ¶ 56].  Capsaicin is the chemical compound that causes spicy heat. [Id.] The Carolina Reaper Pepper contains up to 2.2 million Scoville Heat Units, and the Naga Viper Pepper contains up to 1.4 million Scoville Heat Units. [Id. ¶¶ 57–58]. Capsaicin can cause mouth, throat, stomach and intestinal pain, shortness of breath, chest pain, heart palpitations, nausea and vomiting, and heart attacks or strokes. [Id. ¶ 61].

In 2023, the OCC chip was the subject of a "viral" social media trend called the "One-Chip Challenge," which dared participants to film themselves consuming the exceptionally spicy chip and attempt to resist consuming any beverage or food after consumption that might offset the

body's natural response to eating a hot pepper chip. [Id. ¶¶ 30, 79, 82, 84, 86]. Many videos of individuals participating in the OCC exist online, where people begin crying, turning red, choking, vomiting, fainting, and needing to drink water or milk. [Id. ¶ 82].

The OCC chip is packaged inside of a small box that resembles a coffin, the front side of the box depicts a cartoonish skull and fanged snake, and the interior of the box depicts a cartoonish "Grim Reaper" figure which states, "Face the Reaper" and, "Any last Words?" [Id. ¶¶ 68–71].





Figure 1: Front of Package, Provided in Am. Compl. at 11.

Figure 2: Back of Package, Image Provided in Am. Compl. at 12.

The warning label is on the back of the black box, written in all-caps in red and black ink which imitates caution tape. [Id. ¶ 74]. The warnings are in black text against a white background and state in bullet points:

- Keep out of reach of children.
- Intended for adult consumption.
- Do not eat if you are sensitive to spicy foods, allergic to peppers, night shades or capsaicin, or are pregnant or have any medical conditions.
- After touching the chip, wash your hands with soap and do not touch your eyes or other sensitive areas.
- Seek medical assistance should you experience difficulty breathing, fainting or extended nausea.

[Id.] Between 2021-2022, prior to this suit, there were approximately forty minors who were hospitalized due to negative physical reactions to the OCC chip throughout the country. [Id. ¶¶ 93–97].

### B. The Incident on September 1, 2023

This case arises from the tragic loss of a child's life – H.W., here in Worcester, Massachusetts. [Id. ¶ 47]. Plaintiff alleges that on or about August 31, 2023, a minor child, ("John Doe I") and classmate of H.W., purchased three OCC chips at a Walgreens store located at 320 Park Avenue, Worcester, MA. [Id. ¶ 15]. John Doe I then went to school on September 1, 2023, and shared the chip with other students, including H.W., intending to participate in the TikTok-viral challenge. [Id. ¶¶ 29–31, 50]. At approximately 10:00 a.m., the student gave a dime-sized piece of the chip to several other classmates, including H.W. [Id. ¶ 30; Collective Police Report ("CPR") at 16, ECF No. 65-1].[2] H.W. ingested the portion of one chip, aware of the OCC and the social media trend. [Am. Compl. ¶¶ 30, 34]. Shortly afterward, H.W. began showing signs of distress including sweating and tearing, then he fainted in class. [Id. ¶¶ 34–36]. After regaining consciousness, H.W. complained of stomach pain and presented with confusion. [Id. ¶ 36]. H.W. was then brought to the nurses' office where he was asked if he had ingested any narcotics or alcohol, to which he replied, "no it was the chip." [Id. ¶ 38]. H.W. was then brought home by his family, where later that afternoon he lost consciousness again and suffered respiratory distress. [Id. ¶¶ 42–46]. H.W. died at the hospital that same evening from cardiopulmonary arrest. [Id. ¶¶

---

[2] The Court may consider certain documents the authenticity of which are not disputed by the parties, official public records, documents central to Plaintiffs' claim, and documents sufficiently referred to in the complaint. Watterson v. Page, 987 F.2d 1, 3–4 (1st Cir. 1993) (collecting cases). The Collective Police Reports are attached to the Plaintiff's Amended Complaint, it is sufficiently referred to in the Amended Complaint, and the parties regularly reference the contents of the exhibit throughout their pleadings, therefore, the Court may review the exhibit at the motion to dismiss stage. [Am. Compl. ¶ 12 ("The Plaintiff is attaching herewith the police reports currently in Plaintiff's possession and incorporates these reports by reference.")].

47–48]. H.W.'s Death Certificate noted his "recent ingestion of food substance with high capsaicin concentration in a person with cardiomegaly and myocardial bridging of the left anterior descending coronary artery." [Id. ¶ 48]

Plaintiff Lama-Wolobah, mother of H.W., sued Defendants, Paqui, Amplify, Hershey, Walgreens Eastern Co., Inc, Walgreens of Massachusetts, LLC, and sued James Connolly and Jane Doe individually. [See ECF No. 1-1; Am. Compl.]. Plaintiff asserts several claims, including Negligence, Negligent Failure to Warn, Gross Negligence, Breach of Implied Warranty of Merchantability, Breach of Implied Warranty of Fitness for a Particular Purpose, and violation of Mass. Gen. Laws ch. 93A. [See Am. Compl. at 20–93]. She seeks compensatory damages including loss of consortium, medical expenses, and funeral expenses, as well as punitive damages. [Id. ¶ 114].

### C. Procedural History

Plaintiff filed this action in the Superior Court of Suffolk County, Massachusetts on July 11, 2024. [ECF No. 1-1]. On August 5, 2024, Defendants filed a Notice of Removal. [ECF No. 1]. Plaintiff timely filed a Motion to Remand, [ECF No. 37], which was opposed by Defendants, [ECF No. 39]. In their notice for removal and their opposition to remand, Defendants asserted that Plaintiff fraudulently joined Defendants James Connolly and Jane Doe – store clerks at the Worcester Walgreens location – who are residents of Massachusetts, for the sole purpose of defeating diversity jurisdiction. [ECF No. 1-1 ¶¶ 2–6; ECF No. 39 at 5–12]. After a reply brief was filed and oral argument was heard, on June 30, 2025, the Court denied the Motion to Remand and dismissed James Connolly and Jane Doe from the action on the basis of fraudulent joinder. [ECF Nos. 41, 50, 52]. That Order prompted numerous motions: for reconsideration, entry of separate judgment, interlocutory appeal, and certified question to the Massachusetts Supreme Judicial

5

Court. [ECF Nos. 53–56]. Defendants filed their respective oppositions to the pending motions, [ECF Nos. 59–60], and motions to dismiss the complaint, [ECF Nos. 61, 63]. Plaintiff filed her Amended Complaint in August 2025, which prompted an emergency motion to strike from Defendants and a motion for Joinder. [ECF Nos. 65–66, 68]. The Court addresses those motions in its concurrent order, [ECF No. 87].

Defendants filed their renewed Motions to Dismiss pursuant to the Amended Complaint in late August 2025. [ECF Nos. 72, 74].[3] Plaintiff filed her opposition, and the Court granted the parties leave to file reply and sur-reply briefs. [ECF Nos. 76–80, 83–84]. Defendants then filed a Motion to Strike the sur-reply, [ECF No. 85], which is addressed in the Court's concurrent order, [ECF No. 87].

After many preliminary filings, the Court now turns to the merits of the case in this Order.

## II.    LEGAL STANDARDS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). When deciding a 12(b)(6) motion to dismiss, a court must "accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in the pleader's favor." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012) (citing Nisselson v. Lernout, 469 F.3d 143, 150

---

[3] The Court notes that the Walgreens Defendants in their memorandum for their motion to dismiss states that it "incorporated the arguments advanced" by the Manufacturing Defendants in their memorandum of law. [ECF No. 73 at 1 n.1]. Therefore, the Defendants have not waived any argument regarding manufacturing defect claims or about pre-emption, as suggested in Plaintiff's Opposition Memorandum. [ECF No. 77 at 15 n.10].

(1st Cir. 2006)). Dismissal "is appropriate if the complaint fails to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (citations and quotation omitted).

## III.    DISCUSSION

Plaintiff brings this wrongful death action under the theory of product liability claims. In Massachusetts, product liability claims (*e.g.*, failure to warn, design defect, and manufacturing defect) can be brought under either negligence or breach of warranty action theories. Corrigan v. Covidien LP (Corrigan I), No. 22-cv-10220-DJC, 2022 WL 17094687, at *2 (D. Mass. Nov. 21, 2022) (quoting Laspesa v. Arrow Int'l, Inc., No. 07-cv-12370-NG, 2009 WL 5217030, at *3 (D. Mass. Dec. 23, 2009) (citation omitted)); see also Wajda v. R.J. Reynolds Tobacco Co., 103 F.Supp.2d 29, 34 (D. Mass. 2000). Lama-Wolobah brings her claims under both negligence and breach of warranty theories. The parties in their motion to dismiss briefing argue these claims holistically, rather than a count-by-count basis. [See ECF Nos. 73, 75]. The analysis for these claims, therefore, is largely dependent on one another.

In determining the applicable substantive law in a case under diversity jurisdiction, federal courts apply the choice-of-law principles of the forum state. Levin v. Dalva Bros., 459 F.3d 68, 73 (1st Cir. 2006) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); then citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). "Under Massachusetts choice of law rules, tort claims are governed by the law of the state where the alleged injury occurred, unless another state has a more significant relationship to the cause of action." Dunfey v. Roger Williams Univ., 824 F. Supp. 18, 21 (D. Mass. 1993) (citing Alves v. Siegel's Broadway Auto Parts, Inc., 710 F. Supp. 864, 869–71 (D. Mass. 1989)); see also Cohen v. McDonnell Douglas Corp., 450 N.E.2d

7

581, 585 (Mass. 1983). Here, the injury occurred in Massachusetts, [Am. Compl. ¶¶ 11–12], and neither party claims another state has a more significant relationship to the cause of action, therefore, the Court applies Massachusetts law to the products liability claims at issue.

### A. <u>Counts XXXI-XXXIV against James Connolly and Jane Doe</u>

Noting at the outset of this opinion, as determined by the Court's previous Order on the Motion to Remand, [ECF No. 52], and the Court's concurrent Omnibus Order, [ECF No. 87], Defendants James Connolly and Jane Doe were properly dismissed from this action. Therefore, the Court will not analyze the claims pleaded in the Amended Complaint against these Defendants.

The Motions to Dismiss, [ECF No. 72, 74], as to these Defendants are **<u>GRANTED</u>** on all counts.

### B. <u>Counts I, VII, XIII, XIX, XXV: Negligence against Paqui, Amplify, Hershey, Walgreen Eastern, and Walgreens Massachusetts</u>

When the issue of negligence is before the Court, it is "the conduct of the defendant [that] takes center stage, and liability will be imposed where the defendant 'has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury.'" <u>Haglund v. Phillip Morris, Inc.</u>, 847 N.E.2d 315, 322 n.9 (Mass. 2006) (quoting <u>Colter v. Barber-Greene Co.</u>, 525 N.E.2d 1305, 1313 (Mass. 1988)). In general, for a plaintiff to succeed on a claim of negligence, they "must prove that the defendant owed the plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted, and that there was a causal relation between the breach of the duty and the damage." <u>Jupin v. Kask</u>, 849 N.E.2d 829, 834–35 (Mass. 2006) (citing J.R. NOLAN & L.J. SARTORIO, TORT LAW § 11.1 (3d ed.2005)). The existence of a duty is a question of law, <u>Id.</u>at 832 (quoting <u>Andrade v. Baptiste</u>, 583 N.E.2d 837, 840 (Mass. 1992)), and an appropriate subject of a motion to dismiss pursuant to Rule 12(b)(6). <u>See</u> <u>O'Meara v. New England Life Flight, Inc.</u>, 842 N.E.2d 953, 955 (Mass. App. Ct. 2006) (affirming dismissal

under Rule 12(b)(6) on ground that defendants owed no duty to plaintiff); see also, Remy v. MacDonald, 801 N.E.2d 260, 262 (Mass. 2004) ("If no such duty exists, a claim of negligence cannot be brought."). "The concept of 'duty' . . . is only an expression of the sum total of . . . considerations of policy which lead the law to say that the plaintiff is entitled to protection. . . . No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists.'" Jupin, 849 N.E. 2d at 835 (quoting Luoni v. Berube, 729 N.E.2d 1108, 1113 (Mass. 2000)). Generally, there is no duty to protect others from the "wrongful activities of third persons" unless a special exception applies. Id. (quoting Mullins v. Pine Manor Coll., 449 N.E.2d 331, 335 (Mass. 1983)).

The issue of "causation is generally one of fact left for the jury." Mullins, 449 N.E.2d at 338 (citing Zezuski v. Jenny Mfg. Co., 293 N.E.2d 875, 878 (Mass. 1973)). Further, causation "may be determined as a question of law where there is no set of facts that could support a conclusion that the plaintiff's injuries were within the scope of liability." Leavitt v. Brockton Hosp., Inc., 907 N.E.2d 213, 219 (Mass. 2009) (citing Kent v. Massachusetts, 771 N.E.2d 770, 776 (Mass. 2002)) (collecting cases). "Liability for conduct obtains only where the conduct is both a cause in fact of the injury and where the resulting injury is within the scope of the foreseeable risk arising from the negligent conduct." Id. at 220 (footnote omitted) (citations omitted). In the context of product liability, liability rests on "a product's manufacturer or seller [when it] has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of injury." Sundaramurthy v. Abbott Vascular, Inc., 775 F.Supp.3d 576, 587 (D. Mass. 2025) (quoting Colter, 525 N.E.2d at 1313).

9

     *a.* *Paqui, Amplify, and Hershey ("Manufacturing Defendants")*

First, some administrative clean-up is required. The Court reads the Amended Complaint to assert claims of negligent design, negligent manufacture, and negligent failure to warn in the negligence claims against the Manufacturing Defendants.[4] The Manufacturing Defendants note in their Motion to Dismiss Memorandum that Plaintiff is also asserting theories of Negligent Marketing, Negligent Inspection and Testing, Negligent Distribution, and Negligent Sale. [ECF No. 75 at 19–21]. Negligent marketing is not a recognized separate cause of action under Massachusetts law. See Town of Westport v. Monsanto Co., 877 F.3d 58, 68 (1st Cir. 2017) ("[N]o court, applying Massachusetts law, has ever explicitly held that a negligent marketing claim can be maintained independent of a design defect claim, Commonwealth courts have only opined that absent a design defect, a manufacturer might still be liable if it intentionally targeted children." cf. Killeen v. Harmon Gran Prods., Inc., 413 N.E.2d 767, 772 (Mass. App. Ct. 1980) (holding that it is "impossible to conclude, as matter of law, that there is never negligence involved in retail sales of candy-flavored toothpicks to children, regardless of age.")). [5] Nor does Plaintiff provide any case law or argument in support of a separate cause of action for negligent inspection and testing. Therefore, the Court reads these theories as potential arguments under Plaintiff's negligent design, manufacture, and failure to warn claims, rather than separate causes of action. See e.g., Vasallo v.

---

[4] The Court notes that the Plaintiff re-iterates the assertions in support of her negligent failure to warn claim under both the claims of Negligence and Negligent Failure to Warn for all Defendants, frequently intertwining the assertions for all product liability theories under each claim. For the sake of clarity, the Court will only address the failure to warn assertions under the claims for Negligent Failure to Warn. [See infra Section III.C. (addressing Counts II, VIII, XIV, XX)].

[5] Plaintiff makes numerous assertions throughout her complaint about the social media marketing campaign of the OCC chip and how this marketing "induce[d] minors to consume" the OCC. [Am. Compl. ¶¶ 30, 102]. The Court views these allegations to fall within the framework of negligent design defect theory. Plaintiff may proceed on this theory on the narrow issue of negligent defective design which survives this motion to dismiss action. See Town of Westport, 877 F.3d at 68.

Baxter Healthcare Corp., 696 N.E.2d 909, 921 (Mass. 1998) (citing J.R. NOLAN & L.J. SARTORIO, TORT LAW §§ 292–95 (2d ed. 1989 & 1998 Supp.)) ("[E]vidence of failure [to] adequately test a product is relevant to claims of design, manufacturing, or warning defects, but does not furnish a separate, independent basis for liability."); Restatement (Second) of Torts § 402A (Am. L. Inst. 1965); cf. Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1021 (Mass. 2013) ("Even if a product is properly designed, it is unreasonably dangerous and, therefore, it is not fit for the purposes for which such goods are used, if foreseeable users are not adequately warned of dangers associated with its use.").

Regarding Plaintiff's allegation of "negligent distribution," Defendants argue that this claim "has no merit" because the OCC chip in question was given to H.W. by a classmate, *i.e.* it was not distributed to him from one of the defendants in this case. [ECF No. 75 at 20]; see Kyte v. Philip Morris, Inc., 556 N.E.2d 1025, 1029 (Mass. 1990) (holding that a manufacturer is not liable "simply because they know that their product may be sold to or used by persons who by law may not buy or use it" such as minors). Plaintiff provides no opposition to the Defendants' arguments on this claim. [See generally ECF No. 76]. Therefore, the Court deems any opposition arguments to be waived. Mahoney v. Found. Med., Inc., 342 F. Supp. 3d 206, 217 (D. Mass. 2018) (deeming a claim not addressed in an opposition to a motion to dismiss waived); Perkins v. City of Attleboro, 969 F.Supp.2d 158, 177 (D. Mass. 2013) (same).

With the issues now appropriately narrowed, the Court turns to the duty owed by manufacturers. Manufacturers are "under a duty to use reasonable care to design a product that is reasonably safe for its intended use." Everett v. Bucky Warren, Inc., 380 N.E.2d 653, 658 (Mass. 1978) (quoting W. PROSSER, TORTS § 96, at 645 (4th ed. 1971)); Taupier v. Davol, Inc., 490 F.Supp.3d 430, 445 (D. Mass. 2020) (alteration in original) (citation and quotation omitted) ("A

designer has a duty to design the [product] with reasonable care."). As suppliers of a product, manufacturers are required to exercise reasonable care "not to provide a chattel which it knew or had reason to know was dangerous for its intended use." Everett, 380 N.E.2d at 259 (citing Restatement (Second) of Torts § 388 (Am. L. Inst. 1965)). There is an "'increased responsibility upon the manufacturer, who stands in a superior position to recognize and cure defects, for improper conduct in the placement of finished goods into the channels of commerce.'" Fahey v. Rockwell Graphics Systems, Inc., 482 N.E.2d 519, 524 (Mass. App. Ct. 1985) (quoting Uloth v. City Tank Corp., 378 N.E.2d 1188, 1192 (Mass. 1978)).

Manufacturers may breach their duty of reasonable care when there is a design defect, manufacturing defect, or improper warnings on a product that leads to an injury of a customer. Corrigan I, 2022 WL 17094687, at *3; Evans, 990 N.E.2d at 1010. To succeed on a negligence claim against a manufacturer for product liability, a plaintiff must establish that "the item which it is claimed caused the injury can be traced to that specific manufacturer." Healy v. McGhan Med. Corp., No. CA975320, 2001 WL 717110, at *3 (Mass. 2001) (quoting Piscitello v. Hobart Corp., 799 F.Supp.224, 226 (D. Mass. 1992)). Under Massachusetts law, a manufacturer's duty extends to even remote users who are affected by its products; direct purchase or privity is not required. Karl's Shoe Stores, Ltd. v. United Shoe Mach. Corp., 145 F.Supp. 376, 377 (D. Mass. 1956) (citation omitted); see Payton v. Abbott Labs, 437 N.E.2d 171, 191 (Mass. 1982) (Hennessey, J., dissenting) ("In the case of a manufacturer, the underlying duty of care to those likely to be affected by the product is well established.") There is no contention in this case that Defendants Paqui, Amplify, and Hershey were not the manufacturers and distributors of the OCC chip. Further, their duties described above extended to H.W., who was a consumer allegedly injured by their product. Accordingly, the Court finds that the Manufacturing Defendants owed a duty to the Plaintiff.

### 1. Design Defect

Plaintiff argues that the Manufacturing Defendants, the designers and distributors of the OCC chip, defectively designed its product by including an excessive amount of capsaicin, making the chip unreasonably dangerous for its intended use of human consumption. [Am. Compl. ¶ 62].

To succeed on a claim of design negligence in Massachusetts, a plaintiff must prove that "(1) the manufacturer's failure to exercise a reasonable degree of care under the circumstances; (2) proximate causation; and (3) injury and/or loss." Taupier, 490 F.Supp.3d at 445 (citing Geshke v. Crocs, Inc., 889 F. Supp. 2d 253, 261 (D. Mass. 2012) (footnote omitted), aff'd, 740 F.3d 74 (1st Cir. 2014)). To prove a design defect, a plaintiff must show that the entire product line is defective, not just the specific unit at issue. Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc., 573 F. Supp. 2d 372, 380 (D. Mass. 2008) ("[plaintiff] must show not only that the [unit at issue] malfunctioned, but that the entire [] product line was defective."). Relatedly, a "plaintiff must demonstrate that the defect was present at the time the product was sold and that the defect caused the plaintiff's injury." Liberty Mut. Ins. Co. v. Broan-NuTone LLC, 731 F. Supp. 3d 205, 218 (D. Mass. 2024) (citing first Haglund, 847 N.E.2d at 322, and then Enrich v. Windmere Corp, 616 N.E.2d 1081, 1084 (Mass. 1993)). Massachusetts common law follows the Third Restatement's risk-utility balancing test for defective design claims. See Evans, 990 N.E.2d at 1011. Under section two of the Third Restatement, "[a] product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings." Restatement (Third) of Torts: Products Liability § 2, (Am. L. Inst. 1998). Section two continues to define a "defective design" as "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable

13

alternative design . . . and the omission of the alternative design renders the product not reasonably safe." Id. at § 2(b).

Furthermore, a plaintiff alleging a defective design must "prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented" his injury. Catatao v. Sig Sauer, Inc., No. CV 22-10620, 2024 WL 4011973, at *2 (D. Mass. Jul. 9, 2024) (internal quotation marks and citation omitted); see Ducat v. Ethicon, Inc., 534 F. Supp. 3d 152, 158 (D. Mass. 2021) (alteration in original) (citation and quotation omitted) ("[t]o establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm."); Evans, 990 N.E.2d at 1014. "Although proof of a safer alternative design may ultimately be required, . . . it does not appear that Massachusetts law would require a plaintiff to plead the existence of an alternative design." Taupier, 490 F.Supp. at 446 (internal citations omitted) (collecting cases).

As alleged, Plaintiff argues that the Manufacturing Defendants are liable for negligent design because they were the entities that manufactured and sold the OCC chip into the channels of trade or commerce, and the entities knew or should have known that users across the country had suffered illness to the point of hospitalization, prior to H.W.'s consumption of the product. [Am. Compl. ¶¶ 117–24, 212–219, 307–14]. Plaintiff argues that Defendants were negligent and knew or should have known that the excessive levels of capsaicin made the chip unsafe and unfit for its intended purpose, human consumption. [Am. Compl. ¶ 104]. In support of her defective design theory, Plaintiff states that the chip was not modified between the time of sale to John Doe I and consumption of the chip by H.W. [Id. ¶ 33 ("No one had altered or changed or doctored the

14

chip in any way. The chip was brought to school in the same packaging it was in at the time of purchase.")]. Plaintiff also presents the Court with several theoretical alternative designs, such as,

> Defendants (a) could have and should have developed a chip [that] was still "challengingly hot" to eat, but did not contain lethal amounts of capsaicin; or (b) could have and should have mixed the ingredients in the chip in such a way and such an amount where the chip was still "challengingly hot" to eat, but did not contain lethal amounts of capsaicin; or (c) could have and should have used the same ingredients to create less dangerous (but equally flavorful) seasoning powder and flavoring used in the production of the chip.

[Am. Compl. ¶ 105]. Plaintiff notes a variety of foods on the market today which are "challengingly hot" but argues do not contain a "lethal combination of ingredients." [Id. ¶ 107 (citing Flamin' Hot Cheetos and Franks RedHot hot sauce)].

Defendants counter that Plaintiff's design defect claims fail because Lama-Wolobah did not present the Court with sufficient particularity about the proper amount of capsaicin the chip should have contained for H.W. to avoid harm. [ECF No. 75 at 3, 12]. This is not the standard for design defect claims at the motion to dismiss stage. See Taupier, 490 F.Supp.3d at 445 (alteration in original) (quoting Twombly, 550 U.S. at 556) (the facts alleged in the complaint, "when taken as true, are sufficient to 'raise a reasonable expectation that discovery [may] reveal evidence of' [d]efendant's negligent design and causation."). The standard at the motion to dismiss stage is whether Plaintiff plausibly alleges a claim. Ashcroft, 556 U.S. at 678. Plaintiff does present the Court with potential alternative designs, [Am. Compl. ¶ 105], in these proposed designs, Plaintiff is neither asserting that the OCC chip must be an "entirely different product" nor asserting that an "entire product category should not have been distributed in the first instance," as argued by Defendants. [ECF No. 75 at 15–16; Am. Compl. ¶ 106 ("Defendants could have developed a chip

15

that was half as spicy and/or contained half as much capsaicin, and such a chip would still have been the most 'challengingly hot' tortilla chip on the market.")].

The Court sees the proposed defect as a narrow one. Plaintiff is asserting a design defect claim premised on the *excessive* levels of capsaicin in the OCC chip; she is not arguing that all products with capsaicin are defectively designed, nor that the chip should not be spicy, nor is she arguing that the OCC chip should cease to exist from the market. She asserts only that the configuration of ingredients in this one product, at this period of time, was unreasonably dangerous and led to the death of her teenage son. [See ECF No. 75 at 15; Am. Compl. ¶¶ 117–24, 212–219, 307–14; ECF No. 77 at 20]. On this narrow theory, Plaintiff has alleged sufficient facts to state a plausible claim for relief.

Defendants argue that Plaintiff's claims regarding the amount of capsaicin in the chip are impliedly preempted because the Food and Drug Administration ("FDA") "declined to set a maximum amount of capsaicin that may be used in food." [ECF No. 75 at 3, 16–18]. Defendants argue that any proposed warnings from Plaintiff regarding the "safety" of capsaicin are preempted as a matter of law because the FDA determined that "capsicum (the genus of plants which produces capsaicin)" is generally recognized as safe ("GRAS") and therefore any additional warning, notice, or safe handling statements that the FDA did *not* make as to capsaicin was an intentional exercise of the FDA's authority and cannot be questioned by this Court.[6] [ECF No. 75 at 13; ECF No. 76

---

[6] Whether the FDA determined *capsaicin* is safe is a matter of dispute between the parties. [ECF No. 75 at 13; ECF No. 76 at 19]. Defendants suggest that capsicum (the genus of plants that produces capsaicin) is generally recognized as safe ("GRAS"), as well as several of its extracts, including *capsicum oleoresin*. [ECF No. 75 at 13]. Plaintiffs argue that "[t]he FDA lists only *two* of these peppers species as 'safe,' *Capsicum frutescens L.* (such as paprika or cayenne) and *Capsicum annuum L.* (such as bell peppers) . . . . The peppers used in the [OCC], the Naga Viper and Carolina Reaper, are man-made strains of peppers bred from an entirely different species of pepper, *Capsicum chinense*. . . . The FDA has never commented on the 'safety' of this species of pepper and has certainly never declared these peppers 'GRAS.'" [ECF No. 76 at 19] (emphasis added).

at 19]. The issue before the Court is whether the OCC chip contained an *excessive* amount of capsaicin, not whether the general use of the synthetic extract is considered safe in food. At this juncture, there is not enough information before the Court to determine that the FDA *intentionally* did not set a maximum amount of capsaicin in food, or whether certain thresholds exist for safety purposes.[7] This is a merits question to be resolved with the benefit of discovery. The Defendants may re-introduce these arguments at summary judgment.

The Court is presented with a product which is alleged to have led to the hospitalization of over forty minors and resulted in a death. [Am. Compl. ¶¶ 93–97, 113, 115]. Accepting the truth of all well-pleaded facts, and drawing all reasonable inferences in the pleader's favor, as the Court must at the motion to dismiss stage, it finds that Plaintiff has alleged sufficient facts as to her theory of defective design.

Accordingly, the Motion to Dismiss as to Manufacturing Defendants, Counts I, VII, and XIII, on the theory of defective design is **DENIED**.

---

[7] The Court notes that Plaintiff makes several assertions in support of her negligence claims (predominantly in support of her negligent failure to warn claim, addressed *supra* and dismissed for alternative reasons) which Defendants argue Plaintiff is pre-empted from asserting. Plaintiff alleges that the design defect was in violation of federal law because the excessive levels of capsaicin amounted to a "poisonous or deleterious substance" in violation of the Adulterated Food Code, 21 U.S.C. §331 *et seq.*, and that the "use of synthetic capsaicin and other extracted/synthetic spices and flavorings beyond what could be achieved through naturally-occurring ingredients which are not listed on the [OCC] packaging . . . constitute illegal 'misbranding.'" [Am. Compl. ¶¶ 110, 120, 151, 173, 198, 215, 246, 268, 293, 310, 341, 363, 388]. The federal and state statutes on which Plaintiff relies for these arguments, the Adulterated Food Code (21 U.S.C. § 331 et seq./FDCA) and M.G.L. c. 94, § 186 and 105 CMR 590.001, do not create private rights of action. See Johnson v. Tyson Foods, Inc., 607 F.Supp.3d 790, 807 (W.D. Tenn. 2022) (quoting Edwards v. Warner-Lambert, No. 2:05-cv-657, 2012 WL 2156246, at *4 (S.D. Ohio June 13, 2012) ("It is well-settled that there is no private right of action under the FDCA."); Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S.341, 349 n.4 (2001)( there is "no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" with the FDCA). The enforcement of these statutes lies within the authority of the DOJ, FDA, and the state's public health authorities. See 21 U.S.C. § 331; Mass. Gen. Laws ch. 94, § 186-194. Since Plaintiff is not bringing separate causes of action pursuant to these statutes, the Court reads these statements to be in support of her negligence, breach of warranty, and Mass. Gen. Laws. ch. 93A claims which are properly before the Court.

### 2. Manufacturing Defect

Defendants argue that Plaintiff's claim for manufacturing defect must fail because she alleges that the Manufacturing Defendants intentionally designed the OCC chip with excessive levels of capsaicin, therefore, she cannot claim that the same quality represents a manufacturing defect. [ECF No. 75 at 18]. The Court agrees.

A manufacturing defect "occurs when a product differs from identical products issued from the same manufacturer." Wasylow v. Glock, Inc., 975 F. Supp. 370, 377 (D. Mass. 1996) (citation omitted). To establish the existence of a manufacturing defect, a plaintiff must demonstrate "that there is a 'deviation from the design [that] rendered the product unreasonably dangerous and therefore unfit for its ordinary purposes.'" Burnham v. Wyeth Labs., Inc., 348 F. Supp. 3d 109, 112 (D. Mass. 2018) (alteration in original) (quoting Back v. Wickes Corp., 378 N.E.2d 964, 970 (Mass. 1978)). Indeed, in a manufacturing defect case, the factfinder must "compare the propensities of the product as sold with those which the product's designer intended it to have" and determine "whether the deviation from the design rendered the product unreasonably dangerous and therefore unfit for its ordinary purposes." Back, 378 N.E.2d at 970.

Plaintiff alleges that the Defendants "failed to implement appropriate quality control measures to ensure all [OCC] chips posed the same risks to users." [Am. Compl. ¶ 109]. However, outside of the one line in the Amended Complaint alleging that there were improper quality control measures, there is no allegation that the OCC chips varied in spice or quality, nor does the Plaintiff allege any facts for the Court's consideration that the portion of the chip H.W. consumed differed in any way from the standard OCC chip. The majority of the 569 paragraphs in the Amended Complaint allege facts in support for theories of defective design and failure to warn. [See generally id.].

18

Plaintiff's attempt to cure these pleading defects in her opposition briefing is unpersuasive and improper. See, e.g., Murphy v. Yard, No. 20-40043-TSH, 2021 WL 4295842, at *3 (D. Mass. Sept. 21, 2021) (a plaintiff "cannot avoid dismissal of [their] complaint by asserting new facts and legal claims in [their] opposition that cure the deficiencies in his original pleading."). She argues that the allegation that "Defendants violated [food safety laws] and failed to conduct appropriate hazard analyses" supports a theory of manufacturing defect. [Am. Compl. ¶ 112; ECF No. 76 at 19 –20]. Plaintiff's pleaded assertions are plausibly read as supporting her claims for defective design – alleging that the entire scheme of the OCC chip was designed to be unreasonably dangerous and unfit for the intended use of human consumption. There are no allegations to support a theory that the chip was manufactured in a way that deviated from the entire product line or varied in quality which rendered the product unreasonably dangerous. Back, 378 N.E.2d at 970; Ashcroft, 556 U.S. at 678 (quotations and alterations omitted) (A complaint will not survive a motion to dismiss "if it tenders naked assertions devoid of further factual enhancement.").

Therefore, Plaintiff has failed to allege sufficient facts as to her manufacturing defect theory and the motions to dismiss, [ECF No. 72, 74], as to the theory of manufacturing defects are **GRANTED**.

**b.** *Walgreens Defendants*

Unlike the Manufacturing Defendants, the Walgreens Defendants did not design or manufacture the OCC chip but only acted as the final seller of the product to John Doe I. [Am. Compl. ¶ 468; ECF No. 73 at 5]. Having no relationship to the manufacture or design of the product at issue, Plaintiff's arguments against the Walgreens Defendants focus on whether Walgreen Eastern had a duty to ask John Doe I to present identification or prove his age to the clerks at the store; and that the Walgreens Defendants are liable for negligence because the store displayed the

OCC chips in such a way where they were both freely accessible and enticing to minors. [Am. Compl. ¶¶ 24–26, 28, 52, 467–72]. Ultimately, Plaintiff is arguing that the Walgreens Defendants are liable for negligence because its employees did not prevent the sale of the OCC chip to John Doe I, who the following day shared a portion of the chip with several classmates, including H.W. Plaintiff's theory is predicated on the assumption that any duty the Walgreens Defendants had to its customers extended to H.W., who was not a customer of Walgreens, but a foreseeable end-consumer of a product that Walgreens sold, and that Walgreens knew or should have known that the OCC chip was an unreasonably dangerous product. The Court finds that Walgreens was not under a legal duty to prevent the purchase from John Doe I, therefore, there is no extension of a duty to H.W.

The existence of a duty is a question of law, Jupin, 849 N.E.2d at 833 (quoting Andrade, 583 N.E.2d at 840), and an appropriate subject of a motion to dismiss pursuant to Rule 12(b)(6). See O'Meara, 842 N.E.2d at 955; see also, Remy, 801 N.E.2d at 262. In Massachusetts, "a seller of a product manufactured by another party is not liable in an action for negligence, unless it knew or had reason to know of the dangerous condition that caused the accident." Enrich, 616 N.E.2d at 1084.

The Amended Complaint fails to explain why Walgreen's Eastern had a legal duty to restrict purchasers of the OCC chip from its store, or how the failure to do so amounts to tortious conduct. [Am. Compl. ¶¶ 17, 18]. As noted at length by the parties during the Motion to Remand hearing and the Court's eventual denial order, the product at issue in this case is not a highly regulated, age-restricted item, such as tobacco, alcohol, or fireworks – which Plaintiff frequently analogizes to in her case support. [Am. Compl. ¶ 18; see ECF No. 77 at 7]. The fact that "teenagers share things" is not sufficient to allege that the Walgreens Defendants owed a duty of care to H.W.

to prevent the sale of a food item that was not subject to age-restriction regulations. [See H'rg Tr. at 11:6–7 (Plaintiff's counsel conceded that "[t]here is not a law in Massachusetts saying, you can't sell this tortilla chip to someone under 18.")]. There is a heightened level of scrutiny on manufacturers who have the potential authority and ability to cure defects in a product or recognize its risks prior to placing the item into the channels of commerce. Fahey, 482 N.E.2d at 647 (quoting Uloth, 378 N.E.2d at 1193). There was no legal duty imposed on Walgreens to restrict the sale of the OCC chip from John Doe I. The facts alleged in the Amended Complaint are insufficient to demonstrate that the Walgreens Defendants knew or should have known that the sale of the OCC chip was a dangerous product. Enrich, 616 N.E.2d at 1084.

Accordingly, for the reasons stated above, the Walgreens Defendants' motion to dismiss Plaintiff's claim of negligence is **GRANTED**. [ECF No. 74].

### C. Counts II, VIII, XIV, XX: Negligent Failure to Warn against Paqui, Amplify, Hershey, Walgreen Eastern

Plaintiff brings several failure-to-warn claims predicated on product labeling. [Am. Compl. ¶¶ 74–77, 80]. "A manufacturer of a product has a duty to warn foreseeable users of dangers in the use of that product which he knows or should have known." Bell v. Covidien LP, No. CV 22-11465-FDS, 2023 WL 3006175, at *6 (D. Mass. Apr. 19, 2023) (quoting Mitchell v. Sky Climber, Inc., 487 N.E.2d 1374, 1376 (Mass. 1986)). A manufacturer's liability may be incurred "even if the product does exactly what it is supposed to do, if it does not warn of the potential dangers inherent in the way a product is designed." Id. (quoting Laaperi v. Sears. Roebuck & Co., 787 F.2d 726, 729 (1st Cir. 1986)). "In Massachusetts, a manufacturer can be found liable to a user of the product if the user is injured due to a failure of the manufacturer to exercise reasonable care in warning potential users of hazards associated with the use of the product." Taupier, 490 F.Supp. 3d at 446 (quoting Langlois v. Am. Med. Sys., Inc., 462 F.Supp.3d 1, 4 (D. Mass 2020)). To

recover on this negligence theory, a plaintiff must assert sufficient facts to prove that the manufacturer's failure to warn proximately resulted in the injury. See Jackson v. Johnson & Johnson and Janssen Pharms., Inc., 330 F.Supp.3d 616, 627 (D. Mass. 2018) (quoting Laaperi, 787 F.2d at 729)). "One cannot be held liable for negligent conduct unless it is casually related to injury of the plaintiff." Kent, 771 N.E.2d at 777 (Mass. 2002) (quoting Wainwright v. Jackson, 195 N.E. 896, 897 (Mass. 1935)); see also Glidden v. Maglio, 722 N.E.2d 971, 974 (Mass. 2000) (causation "is an essential element" of proof of negligence).

Under Massachusetts law, the causation element of a negligence claim contains two components: factual causation and proximate causation, and both components are required to maintain a negligence claim. See Staelens v. Dobert, 318 F. 3d 77, 79 (1st Cir. 2003). Factual causation requires the plaintiff to plausibly allege that the harm would not have occurred "but for" the defendant's conduct. Doull v. Foster, 163 N.E.3d 976, 983 (Mass. 2021) (citing W.L. PROSSER & W.P. KEETON, PROSSER AND KEETON ON TORTS § 41 at 265 (5th ed. 1984)). Proximate causation depends on whether the "injury to the plaintiff was a foreseeable result of the defendant's negligent conduct." Kent, 771 N.E.2d at 777 (citing Jesionek v. Mass Port Auth., 378 N.E.2d 995, 997 (Mass. 1978)). "If a series of events occur between the negligent conduct and the ultimate harm, the court must determine whether those intervening events have broken the chain of factual causation or, if not, have otherwise extinguished the element of proximate cause and become a superseding cause of the harm." Id. (citing Jesionek, 378 N.E.2d at 997).

a.  *Manufacturing Defendants*

Plaintiff asserts a claim of negligent failure to warn against the Manufacturing Defendants Amplify, Paqui, and Hershey. [Am Compl. ¶¶ 135–43, 231–38, 326–33]. Plaintiff asserts that the product label was deficient in the following ways: (1) it insufficiently warned and/or instructed

consumers of the unreasonably dangerous and defective design or manufacture of the product; (2) it did not give proper notice to consumers of the risks of the product; and (3) the warning label was contradicted by the companies' social media advertising. [Id.][8] As discussed below, these arguments fail as a matter of law because Plaintiff fails to plead essential elements of the claim, and her assertions within her Amended Complaint indicate that the injury would not have been prevented even with her suggested heightened warnings.

Although the First Circuit instructs that there is a general presumption that if a proper warning was given, it would be heeded by the listener, a failure to warn claim can still fail if a plaintiff cannot meet the elements of her claim. See Wilson v. Bradlees of New Eng., Inc., 250 F.3d 10, 15–16 (1st Cir 2001) (citing Restatement (Second) Torts, § 402, cmt. j (Am. L. Inst. 1965)). For example, when it is clear on the face of the pleadings that the injured party did not read or rely on the warnings given, a failure to warn claim fails as a matter of law due to lack of causation. See Corrigan v. Covidien LP (Corrigan II), 748 F.Supp.3d 1, 13 (D. Mass. 2024)[9] (citing Santos-Rodríquez v. Seaster Sols., 858 F.3d 695, 698 (1st Cir. 2017)); see also Wasylow, 975 F.Supp. at 378 (citing Laaperi, 787 F.2d at 729) ("[A]s with all negligence allegations, failure to

---

[8] Plaintiff additionally makes several arguments regarding misbranding, adulteration, and serving sizes. [Am. Compl. ¶¶ 110–12, 120–122, 151–53, 172–74, 214–16, 246–47, 268–69, 310–11, 341–42, 363–64]. This Court need not dive into the complicated analyses of the standards of branding versus misbranding or appropriate serving size labeling because the issue of Plaintiff's claim for negligent failure to warn can be determined on Plaintiff's own allegations.

[9] Negligent failure to warn causes of action are frequently brought in litigation regarding pharmaceuticals and medical devices, where under the "learned intermediary doctrine, the manufacturer's duty to warn runs to the physician" rather than to the patient directly. See Corrigan II, 748 F.Supp.3d at 12; see also In re Fresenius GranuFlo/NaturaLyte Dialysate Prods. Liab. Litig., 691 F. Supp. 3d 280, 295 (D. Mass. 2023). The learned intermediary doctrine is not relevant to the present case, therefore, the manufacturer's duty to warn runs to the "user of the product if the user is injured due to the failure of the manufacturer to exercise reasonable care in warning potential users of the hazards associated with the use of the product." Laaperi, 787 F.2d at 729.

warn will not constitute negligence if it is not the proximate cause of the plaintiff's injuries.").[10]

A plaintiff may succeed on a failure to warn theory, only if, "an additional or different warning would have so alerted the plaintiff that the [injury] would not have occurred." Bell v. Wysong & Miles Co., 531 N.E.2d 267, 269 (Mass. App. Ct. 1988). Where "there is no evidence that [an] additional or different warning" would have prevented the injury, "no reasonable jury could find for a plaintiff on a failure-to-warn theory." Geshke v. Crocs, Inc., 889 F.Supp.2d 253, 263 (D. Mass. 2012) (quoting Bell, 531 N.E.2d at 269).

> Plaintiff provides the Court with the product label at issue which explicitly states:
>
> - Keep out of reach of children.
> - Intended for adult consumption.
> - Do not eat if you are sensitive to spicy foods, allergic to peppers, night shades or capsaicin, or are pregnant or have any medical conditions.
> - After touching the chip, wash your hands with soap and do not touch your eyes or other sensitive areas.
> - Seek medical assistance should you experience difficulty breathing, fainting or extended nausea.

[Am. Compl. ¶ 74]. The Court notes that these warnings are surrounded by red caution tape with a bolded and capitalized "WARNING" label. [Id.] Plaintiff argues that because the warnings were on the back of the box, it was hidden from users of the product. [Id.] However, just because a warning is on the back of the box, does not mean it was "hidden," particularly when it is surrounded by red caution tape and written in clear black font on a white background. See, e.g., Torres-Rios v. LPS Labs., Inc., 152 F.3d 11, 14-15 (1st Cir. 1998) (affirming dismissal of defective warning claim where warning used "prominent red-and-white" colors). Plaintiff states that the label as provided is insufficient because it does not include warnings such as, "the risk of death"; "the risk

---

[10] The Court notes that the records in the cases cited were developed after discovery and determined on summary judgment. However, when the pleadings and arguments made on the Plaintiff's behalf make it apparent at the motion to dismiss stage that the adequacy of the warnings were not the cause of the injury, then Plaintiff cannot succeed on her *prima facie* case.

of heart failure"; "the risk of hospitalization"; "the amount of capsaicin contained in the product or any description of what capsaicin is and its known effects on the human body"; "the amount of time a user of the product should expect to experience effects of the product and/or risks to health from the product"; "the risks of sharing the product with other people who have not reviewed the warnings or ingredients listed on the packaging"; and "the risk of consuming the product without prior consultation with one's physician." [Am. Compl. ¶ 76]. Plaintiff asserts that if the packaging included these heightened warnings, then H.W. would not have died. [Id. ¶ 80]. However, as pleaded, Plaintiff fails to allege that a different or additional warning would have prevented her injury.

First, Plaintiff never alleges in her Amended Complaint that H.W. read the available warnings or that he would have heeded the proposed warnings. [See Am. Compl.]. Notably, although not dispositive to this motion, during the motion for remand argument, Plaintiff's counsel conceded that H.W. never read the warnings on the product label, [H'rg Tr. at 14:12–17], and that H.W. received the chip when it was already outside of its packaging. [Id.] The Court cannot rely on these admissions from counsel on a motion to dismiss without converting the proceedings into summary judgment. The admission, therefore, cannot be the central consideration for this Court in determining the sufficiency of the claim. See Young v. Lepone, 305 F.3d 1, 11–12 (1st Cir. 2002) ("The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint.").

The Court does note that Defendants rely heavily on the admissions made by counsel during oral argument in their Motion to Dismiss briefings and Plaintiff's opposition briefs do not controvert those assertions or argue that the facts admitted are not true. [See ECF Nos. 76, 77]. See Sigma-Aldrich Corp. v. Stonebrook, No. 23-cv-10140-DJC, 2025 WL 1927623, at *7 (D.

Mass. July 12, 2025) (citing Uranga v. U.S. Citizenship & Immigr. Servs., 490 F. Supp. 3d 86, 109 (D.D.C. 2020) (explaining that "when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). Mahoney, 342 F. Supp. 3d at 217; Perkins, 969 F.Supp.2d at 177. Additionally, Plaintiff appended the Collective Police Reports to her Amended Complaint which indicate that John Doe I offered H.W. a portion of the chip by extending the *open* package to him and other classmates. [CPR at 17, 19]. Further, there is no assertion within the Amended Complaint or statement within the CPR which indicates that H.W. personally read the warnings available. [Am. Compl. ¶ 87].

Instead, Plaintiff's theory of the case is not that these heightened warnings would have influenced H.W.'s decision to ingest the OCC chip, but that the heightened warnings or restrictions would have prevented the purchase of the OCC chip in the first place by John Doe I or would have prevented him from sharing the OCC chip with H.W. [Am. Compl. ¶¶ 80, 143, 160, 183, 224, 238 ("Had the warnings . . . been present, [John Doe I] . . . would have not shared the chip, and . . . [H.W.] would not have consumed the chip, and [H.W.] would not have suffered and died.")]. To succeed on a negligent failure to warn theory, Plaintiff must assert facts that plausibly allege that the insufficient warning was the proximate cause of her harm and that an additional or heightened warning would have prevented the injury. See Wasylow, 975 F.Supp. at 378; see also Bell, 531 N.E.2d at 269. Therefore, the Court's analysis of Plaintiff's failure to warn claims, aligning with Plaintiff's assertions in the Amended Complaint, does not focus on whether any additional or heightened warning on the product label would have influenced H.W.'s choice to try the OCC chip, but whether the warnings were sufficient for John Doe I. As noted, supra, "a manufacturer of a product has a duty to warn foreseeable users of dangers in the use of that product which he

knows or should have known." Bell, 2023 WL 3006175, at *6. That duty to warn exists for purchasers of the product, including John Doe I.

The issue before the Court is whether Plaintiff's Amended Complaint sufficiently alleges facts to support her theory that a heightened warning given to John Doe I would have prevented the purchase or sharing of the OCC chip. The Court finds that as alleged, Plaintiff fails to state a claim for relief, in large part because Plaintiff consistently argues against her own theory that a heightened warning would have prevented John Doe I's purchase or sharing of the chip.

In the Amended Complaint, Plaintiff argues that teenage boys "intentionally engage in risky and dangerous behavior" and frequently consume the chip "without even having seen or read any of the descriptions contained on and within the chip's packaging." [Am. Compl. ¶¶ 20, 87]. Within the Amended Complaint, Plaintiff consistently states that teenage boys frequently share age-restricted items, participate in dangerous challenges, are "generally recognized as awful judges of risk and dangerous behavior," and are considered "risk-seeking." [Am. Compl. ¶¶ 18–20, 79, 81]. Specifically, Plaintiff alleges that:

> 18. Teenagers are known to share all sorts of things that are not good for them including but not limited to: alcohol, cigarettes, e-cigarettes, vape pens, tobacco pouches, nicotine pouches, weed, weed edibles, Robitussin, Benadryl, spray paints, and fireworks. Teenagers share these things at school, at parks, on streets, at people's houses, in people's cars, and at parties.
>
> 19. Teenagers have been seen participating in dangerous challenges on Tik Tok and other social media sites prior to and after the release of the 2023 "One Chip Challenge" chip.
>
> 20. Teenagers, especially teenage boys, are generally recognized as awful judges of risk and dangerous behavior, and they are generally known to intentionally engage in risky and dangerous behavior.

[Id. ¶¶ 18–20]. Plaintiff continues to hurt her own failure to warn allegation by stating that, customers frequently consumed the chip, "without ever having seen or read any of the descriptions

contained on and within the chip's packaging," and that consumers frequently "remove [the chip] from the packaging and share pieces" of the chip to participate in the OCC with friends. [Am. Compl. ¶¶ 87–88]. Plaintiff also argues that the manufacturer's warnings as provided on the package were an "enticement" to risk-seeking youth such as John Doe I. [ECF No. 76 at 22 ("Nothing is more enticing to a minor than to get their hands on something for adults only. Defendants' 'warning' is an enticement, not a deterrent.")]. Plaintiff cannot argue that the warnings were so deficit that the teenage boys in this action could not have perceived the danger of the product and simultaneously argue that the existing warnings were an enticement to the danger. The facts alleged do not support the cognizable legal theory presented by Plaintiff. See Favreau v. Liberty Mut., Inc., 451 F. Supp. 3d 150, 159 (D. Mass. 2020) (citing Gagliardi, 513 F.3d at 305) ("In order to sustain a Rule 12(b)(6) challenge, a complaint must contain facts that satisfy each required element under a cognizable legal theory of recovery.").

Plaintiff's opposition argument relies on Moon v. Instant Brands LLC, which states that a Plaintiff is "not required to state in the complaint that she reviewed or relied upon the warnings . . . because there is a general presumption that consumers will read and follow warnings provided by manufacturers." No. 1:22-cv-11814-AK, 2023 WL 3126078, at *5 (D. Mass. Apr. 27, 2023); [See ECF No. 76 at 23; see also ECF No. 77 at 25]. This case is distinguishable for several reasons. In the Moon case, a *pro se* plaintiff brought a failure to warn claim against Instant Brands LLC, alleging that the company failed to warn her of the danger of its Pyrex baking tray "spontaneously breaking apart." 2023 WL 3126078 at *1. Judge Kelly ultimately granted the motion to dismiss without prejudice because the plaintiff's failure to warn claim was deficient as to the essential elements to state a claim, where she failed to allege "(1) whether there was any warning label, public notice, and/or recall of the product, (2) what the warning was, and (3) why it was

28

nonetheless insufficient." Id. at *5. In the present case, the issue before the Court is not whether there was *any* warning provided to the Plaintiff, but an issue of whether the warnings provided were *sufficiently* provided to a third party – John Doe I – and whether the given warning was sufficient to either prevent the sale in its entirety, or sufficient to incline John Doe I to inform the decedent of dangers in the product.

Plaintiff's argument that additional warnings on the packaging would have influenced *John Doe I's* decision to purchase and share the OCC chip is speculative and unpersuasive and does not support a finding of proximate causation. Plaintiff's theory of causation is "too attenuated to support a reasonable inference of proximate cause." Sigma-Aldrich Corp, 2025 WL 1927623, at *6 (citing Paroline v. United States, 572 U.S. 434, 445 (2014)); [Am. Compl. ¶ 80, 143, 160, 183, 224, 238 ("Had the warnings . . . been present, John Doe I . . . would have not shared the chip, and . . . H.W. would not have consumed the chip, and . . . H.W. would not have suffered and died.")]. While the Court must make all inferences in favor of the Plaintiff when ruling on a motion to dismiss, the Court "need not accept bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." Vega v. Cruz-Burgos, 537 F.3d 14, 20 (1st Cir. 2008) (internal quotation marks omitted) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir.1996)). At a minimum, John Doe I's conduct indicates that he did not read, or actively ignored, the current labels which included "[k]eep out of reach of children" and "[i]ntended for adult consumption," when he purchased the chip and shared it with several classmates who were all minors. [Am. Compl. ¶¶ 30, 74]. Plaintiff's own assertions of teenage boys' disregard for product labels and proclivity for dangerous activities ultimately makes her theory an unsupportable conclusion. [Id. ¶¶ 18–20, 79, 81].

Further, failure to plead that an additional or different warning to *H.W.* would have prevented the injury to H.W. is dispositive on the issue of proximate causation. See Corrigan II, 748 F.Supp.3d at 14 (holding that the defendants rebutted the presumption that the plaintiff "would have heeded any warning [given evidence in the record] and that the Plaintiffs' have not shown a triable issue of material fact as to causation"). Plaintiff's proffered causal chain between the product's warning label, a possible alternative warning, John Doe I's conduct, the unclear circumstances of the presentation of the product to the decedent, and the decedent's own awareness of any warnings is winding and circuitous; it calls for extrapolated and attenuated connections that the proximate cause requirement is designed to prevent. See Paroline, 572 U.S. at 445 (explaining that "[a] requirement of proximate cause thus serves . . . to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity").

Even after applying the 12(b)(6) standard, where the Court must "draw all reasonable inferences therefrom in the pleader's favor," Grajales, 682 F.3d at 44 (citing Nisselson, 469 F.3d at 150), Plaintiff cannot overcome the allegations of her own complaint that undermine the theory of her claims. For the stated reasons, the Manufacturing Defendants' motion to dismiss, [ECF No. 74], as to the Negligent Failure to Warn claim is **GRANTED**.

b.    *Walgreens Defendants*

Plaintiff brings a claim of negligent failure to warn against the Walgreens Defendants, asserting that the entities had a duty to warn and or instruct consumers and all foreseeable users of the products it sold, of the unreasonably dangerous and defective design and manufacture of the OCC chip. [Am. Compl. ¶¶ 411–416; 480–81].

In her Amended Complaint, Plaintiff informs the Court that H.W. did not purchase the OCC chip, nor was he with the minor who bought it. [Am. Compl. ¶¶ 15–16; Hr'g Tr. at 8:6–7]. Therefore, Walgreens Eastern could not provide H.W. with a heightened warning directly. Any duty to warn, therefore, would be to John Doe I, not to H.W. See Town of Princeton v. Monsanto Co., Solutia Inc., 202 F.Supp.3d 181, 197 (D. Mass. 2016) (dismissing post-sale duty to warn claim for failing to allege how defendant could identify end users other than through direct purchasers). Although in the First Circuit, it is assumed that if a consumer were to be given a proper warning they would heed it, Wilson, 250 F.3d, 15–16, in the present case, Plaintiff's assertions directly contradict any assumption that a heightened warning would change the decision making of John Doe I. [Am. Compl. ¶¶ 18–20, 79, 81]. Regardless, because Walgreens did not owe a duty to warn to H.W., Plaintiff cannot maintain a claim of negligent failure to warn.

For the stated reasons, the Walgreens Defendants' motion to dismiss, [ECF No. 72], as to the Negligent Failure to Warn claim is **GRANTED**.

D. **Counts III, IX, XV, XXI: Maliciousness, Willfulness, Wantonness, Recklessness, and/or Gross Negligence against Paqui, Amplify, Hershey, Walgreen Eastern**

Plaintiff brings a claim of maliciousness, willfulness, wantonness, recklessness, and/or gross negligence against the Manufacturing and Walgreens Defendants, on the same recitation of facts for the negligence and product liability claims. This claim is based on a failure to warn theory and that the Manufacturing Defendants breached the duty to warn by contradicting the warnings on its package in social media advertising and the design of its package. [Am. Compl. ¶¶ 148–62, 243–57, 338–52]. Against the Walgreens Defendants, the Amended Complaint asserts that the fact Walgreens allowed children to purchase the OCC chip amounts to grossly negligent behavior. [Id. ¶¶ 421–27].

31

Under the Massachusetts wrongful death statute, Mass. Gen. Laws. ch. 229, §2, punitive damages are recoverable where "the decedent's death was caused by the malicious, willful, wanton or reckless conduct of the defendant or by the gross negligence of the defendant." A plaintiff asserting a gross negligence tort claim must prove that general negligence exists. McLeod v. Fessenden Sch., 624 F. Supp. 3d 45, 50 (D. Mass. 2022) (citing Jorgensen v. Mass. Port Auth., 905 F.2d 515, 522 (1st Cir. 1990)). Negligence and gross negligence are governed by state law. The Massachusetts Supreme Judicial Court has noted that,

> Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence . . . . It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the want of even scant care . . . . The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence. Gross negligence is a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence.

Aleo v. SLB Toys USA, Inc., 995 N.E.2d 740, 752 (Mass. 2013) (quoting Altman v. Aronson, 121 N.E. 505, 507 (Mass. 1919)). Gross negligence "amounts to indifference to present legal duty and to utter forgetfulness of legal obligations so far as other persons may be affected." Altman, 121 N.E. at 506. In Massachusetts, a defendant's conduct will be considered reckless when,

> he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Rafferty v. Merck & Co., 92 N.E.3d 1205, 1220 (Mass. 2018) (quoting Boyd v. National R.R. Passenger Corp., 845 N.E.2d 356, 362–63 (2006) (quoting Restatement (Second) of Torts, supra, § 500)). For a defendant to be considered "reckless," the conduct must be intended, and "requires a conscious choice of a course of action, . . .  with knowledge of the serious danger to others

involved in it," and the conduct must "involve[] a substantially greater risk than is required for ordinary negligence." <u>Rafferty</u>, 92 N.E.3d at 1220 (quoting <u>Boyd</u>, 845 N.E.2d at 363).

As noted <u>supra</u>, Plaintiff's claims for ordinary negligence and failure to warn have been significantly curtailed by the Court or have been found to be insufficient to survive the pending motions to dismiss. To succeed on a theory of gross negligence, the complaint must demonstrate a magnified, or substantially greater, degree of negligence. <u>Aleo</u>, 995 N.E.2d at 752. To succeed on a theory of recklessness, the Plaintiff must show that the Defendant intended the conduct. <u>Rafferty</u>, 92 N.E.3d at 1220. Here, the Amended Complaint fails to establish that any Defendant in this case acted in such a way that could be described as grossly negligent, malicious, or reckless.

Therefore, the motions to dismiss as to Counts III, IX, XV, XXI, XXVI must be **<u>GRANTED</u>** for failure to state a claim.

### E. <u>Counts IV, X, XVI, XXI: Breach of Implied Warranty of Merchantability Based on a Design Defect or Failure to Warn against Paqui, Amplify, Hershey, Walgreen Eastern</u>

Plaintiff brings claims of Breach of Implied Warranty of Merchantability against the Manufacturing Defendants asserting that the OCC chip was unreasonably dangerous and defective and/or not safe for ordinary and foreseeable uses for which it was sold. [Am. Compl. ¶¶ 165–87, 261–82, 356 –77]. Plaintiff also brings this cause of action against the Walgreens Defendants, asserting that as a merchant or seller under Mass. Gen. Laws ch. 106, Article 2 § 2-314, Walgreens breached its duty by selling the OCC chip to a minor. [<u>Id.</u> ¶¶ 431–43].

By statute, the implied warranty of merchantability requires that goods be "fit for the ordinary purposes for which such goods are used[.]" Mass. Gen. Laws ch. 106, § 2-314(c). "A seller breaches its [implied] warranty obligation when a product that is defective and unreasonably dangerous, for the [o]rdinary purpose' for which it is fit causes injury." <u>Haglund</u>, 847 N.E.2d at

322 (alteration in original) (internal citations and quotation marks omitted). As the SJC has explained, the "ordinary purposes" contemplated by this statutory provision "include both those uses which the manufacturer intended and those which are reasonably foreseeable." Back, 378 N.E.2d at 969 (citation omitted). A product's "fitness" depends primarily, but not exclusively, on "reasonable consumer expectations." Haglund, 847 N.E.2d at 322 (citing Back, 378 N.E.2d at 970). The "relevant inquiry" for both ordinary purpose and fitness "focuses on the product's feature, not the seller's conduct." Id. (citation omitted). Once again, foreseeability is a key consideration for liability, as "the manufacturer is not expected to design against 'bizarre, unforeseeable accidents,'" but "the manufacturer will be liable if its 'conscious design choices' fail to anticipate the reasonably foreseeable risks of 'ordinary' use." Id. at 322–23 (quoting Back, 378 N.E.2d at 970). While many implied warranty claims are brought by direct consumers of a defendant's products, there is no requirement of privity when "the plaintiff did not purchase the goods from the defendant if the plaintiff was a person whom the manufacturer, seller, lessor or supplier might reasonably have expected to use, consume or *be affected by the goods*." Mass. Gen. Laws ch. 106, § 2-318 (emphasis added).

Warranty liability may be premised on theories of "manufacturing, design or warning defect that makes the product unreasonably dangerous." Provanzano v. MTD Prods. Co.*,* 215 F. Supp. 3d 134, 137 (D. Mass. 2016) (citing Evans, 990 N.E.2d at 1010). As discussed, supra, only the theory of defective design is properly pleaded in the Amended Complaint. As Plaintiff is bringing an implied warranty of merchantability claim based on a defective design, she must plead facts sufficient to allege that:

> (1) the defendant manufactured or sold the product that eventually injured [them];
> (2) the product had a defect or otherwise unreasonably dangerous condition such that it was unsuited for the ordinary use for which it was sold; (3) [they were affected by] the product ... in a manner that was at least foreseeable to the defendant;

34

and [4] the defect or unreasonably dangerous condition was a legal cause of the their injury."

Taupier, 490 F.Supp.3d 430, 439–40; Mass. Gen. Laws ch. 106, § 2-318; Zoll Med. Corp. v. Barracuda Networks, Inc., 565 F. Supp. 3d 101, 107 (D. Mass. 2021); see Town of Westport v. Monsanto Co., Civil Action No. 14-12041, 2017 WL 1347671, at *4 (D. Mass. Apr. 7, 2017) (quoting Everett v. Bucky Warren, Inc., 380 N.E.2d 653, 660 (1978))("To demonstrate that a product is defective under a design defect theory, it must be shown that the product was 'made according to an unreasonably dangerous design and does not meet a consumer's reasonable expectation as to its safety.'"), aff'd, 877 F.3d 58 (1st Cir. 2017) .

In Massachusetts, a defendant may still be found liable for a breach of the implied theory of merchantability without having been negligent, however, the reverse is not true. Colter, 525 N.E.2d at 1313; Hayes v. Ariens Co., 462 N.E.2d 273, 275 (Mass. 1984)); see also Evans, 990 N.E.2d at 1025 (alteration in original) (quoting Haglund, 847 N.E.2d at 322) ("[a] defendant cannot be found to have been negligent without having breached the warranty of merchantability."). Accordingly, if a negligence claim survives a motion to dismiss, an implied warranty of merchantability claim based on the same facts must also survive.

### a. Manufacturing Defendants

Plaintiff asserts in her Amended Complaint that Defendants Amplify, Paqui, and Hershey were "engaged in the design, manufacture, distribution, inspection, testing, and marketing, and/or sale of the" OCC chip which eventually injured the decedent; these Defendants are merchants under Mass. Gen. Laws. ch. 106, Article 2 §2-314, with respect to goods of that kind; and that these Defendants had a duty to ensure that their product was merchantable. [Am. Compl. ¶¶ 165–87, 261–82, 356–77]. The ordinary and foreseeable use of the OCC chip, consumption, was

practiced by the decedent. [Id. ¶ 33]. Because the negligence claim survives the motions to dismiss based on defective design, so too will the claim for implied warranty of merchantability as to defective design. Colter, 525 N.E.2d at 1313; Hayes v. Ariens Co., 462 N.E.2d 273, 275 (Mass. 1984)); see also Evans, 990 N.E.2d at 1025 (alteration in original) (quoting Haglund, 847 N.E.2d at 322) ("[a] defendant cannot be found to have been negligent without having breached the warranty of merchantability.").

   b.  *Walgreens Defendants*

   As noted supra, the Walgreens Defendants did not manufacture, inspect, or test the OCC chip. However, Walgreens was the final seller of the OCC chip at issue in this case and is alleged to be a merchant under Mass. Gen. Laws ch. 106, Article 2 § 2-314 with respect to goods of that kind. [Am. Compl. ¶¶ 434, 499]. Although Walgreens owed no duty in negligence, warranty liability does not depend on fault or duty, but on whether the product was defective and unreasonably dangerous. See Haglund, 847 N.E.2d at 322 (citing Colter, 525 N.E. at 1313) ("In determining warranty liability [for defective design], the relevant inquiry focuses on the product's features, not the seller's conduct."). Additionally, "warranties may extend to third parties when it is reasonable to expect those persons may use the goods and they are injured by the breach of warranty." Hatch v. Trail King Indus., Inc., 656 F.3d 59, 65 (1st Cir. 2011) (citing Mass. Gen. Laws ch. 106, §2-318). It is reasonable to expect that the OCC chip would be consumed after purchase by the buyer or a third-party such as H.W. Because Walgreens was the seller of the OCC chip, and it was foreseeable that a consumer such as H.W. would consume the product, the claim of the implied warranty of merchantability claim will survive as long as the negligent defective design claim is pending before the Court.

Much of the allegations against Walgreens focus on the failure to warn claim, which is properly dismissed from this action. [See supra Section III.C.].  As the Court has previously dismissed the failure to warn claim in this case against Walgreens, the implied warranty claim will also fail. Therefore, the motions to dismiss, [ECF No. 72, 74], as to Counts IV, X, XVI, XXI as far as they are relevant to a failure to warn claim are **GRANTED**. The Plaintiff may proceed with claims related to defective design. The motions to dismiss, as to Counts IV, X, XVI, XXI as far as they are relevant to a defective design claim are **DENIED**.

**F.  <u>Counts V, XI, XVII, XXIII, XXIX: Breach of Implied Warranty of Fitness for a Particular Purpose against Paqui, Amplify, Hershey, Walgreen Eastern, and Walgreens Massachusetts</u>**

Plaintiff brings a claim of breach of implied warranty for particular purpose against the Manufacturing and Walgreens Defendants. Plaintiff asserts that the Defendants placed the OCC chip into the stream of commerce and knew or should have known that H.W. wanted the chip for the particular purpose of participating in the "One Chip Challenge" and that the Defendants impliedly warranted to its customers and foreseeable participants that the chip was fit for the particular purpose of safe food consumption. [Am. Compl. ¶¶ 189–203, 284–98, 380–93, 446–60, 510–25]. Plaintiff fails to allege sufficient facts to support her claim for implied warranty of fitness for a particular purpose.

"The warranty of fitness for a particular purpose is similar to the warranty of merchantability but applies only 'where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods.'" Pub. Serv. Mut. Ins., 573 F. Supp. 2d 372, 381 (quoting Mass. Gen. Laws ch. 106, § 2–315). "A 'particular purpose' differs from an 'ordinary purpose' in that it 'envisages a specific use by the buyer which is peculiar to the nature of his

business.'" Id. (quoting Mass. Gen. Laws ch. 106, § 2–315). Failure to allege that the product had a particular purpose "that differed from the purpose for which it was ordinarily used" is fatal to stating a viable claim. Taupier, 490 F.Supp.3d at 444. There is no implied warranty unless the purchaser communicates the particular purpose they have in mind for the product to the seller. Rule v. Fort Dodge Animal Health, Inc., 604 F. Supp. 2d 288, 297 (D. Mass. 2009), aff'd, 607 F.3d 250 (1st Cir. 2010).

The Manufacturing Defendants argue that the cause of action for the implied warranty is not relevant in this case because the same intended purposes, human consumption and participation in the One Chip Challenge, are the foundation for both implied warranty claims. [ECF No. 75 at 21].[11] Upon review of the Plaintiff's opposition brief, there is no argument presented that the dismissal of these claims would be improper. [See generally ECF No. 76]. The Court may therefore, deem these counts as waived. See Sigma-Aldrich Corp. v. Stonebrook, No. 23-cv-10140-DJC, 2025 WL 1927623, at *7 (D. Mass. July 12, 2025) (citing Uranga v. U.S. Citizenship & Immigr. Servs., 490 F. Supp. 3d 86, 109 (D.D.C. 2020) (explaining that "when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded"); Mahoney, 342 F. Supp. 3d at 217; Perkins, 969 F.Supp.2d at 177. However, even if Plaintiff presented an opposition argument on these counts, the Amended Complaint fails to establish the information necessary to state a claim for relief on these facts.

Here, Plaintiff alleges that the purpose of the chip is to be consumed as part of the One Chip Challenge. [Am. Compl. ¶¶ 192–201, 288–96, 382–91, 450–57, 515–22]. This is the same purpose as the "ordinary purpose" Plaintiff alleges for her implied warranty of merchantability

---

[11] The Walgreens Defendants conflate the related doctrines of implied warranty for particular purpose and implied warranty of merchantability in their motion to dismiss arguments. [ECF No. 73 at 18–19].

claim. Plaintiff does not allege any other purpose that is separate and apart from this ordinary purpose. Because Plaintiff fails to allege that the OCC chip was used "for a purpose that differed from the purpose which it was ordinarily used," or that any alternative intended use was communicated to the seller, Plaintiff cannot establish a claim for an implied warranty of fitness for particular purpose. Taupier, 490 F.Supp.3d at 444; Pub. Serv. Mut. Ins., 573 F.Supp.2d at 381.

Therefore, Defendants' motions to dismiss Plaintiff's breach of implied warranty of fitness for particular purpose, Counts V, XI, XVII, XXIII, XXIX, are **GRANTED**. [ECF Nos. 72, 74].

### G. Counts VI, XII, XVIII, XXIV: Mass. Gen. Laws ch. 93A against Paqui, Amplify, Hershey, and Walgreen Eastern

Plaintiff brings a claim under Mass. Gen. Laws ch. 93A, ("Chapter 93A"), arguing that because the Manufacturing and Walgreens Defendants breached the implied warranties, they have committed an unfair and deceptive act within the statutory framework of Chapter 93A. [Am. Compl. ¶¶ 206–09; 301–04, 396–99, 462–66]. Defendants note that the implied warranty claims and Chapter 93A are interconnected, therefore, the claims must rise and fall together. [ECF No. 75 at 21].[12] Plaintiff's Chapter 93A claim is based in part on a theory of the implied warranty of merchantability, which survives this motion to dismiss action.

Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, §2(a). To assert a Chapter 93A claim, a plaintiff must allege, "(1) a deceptive act or practice on the part of the defendant; (2) an injury or loss suffered by the plaintiff, and (3) a causal connection between the [D]efendants' deceptive act or practice and the plaintiff's injury." Wagner v. Fed. Home Loan Mortg. Corp., 494 F.Supp. 3d 80, 87 (D. Mass. 2020) (citation and quotation omitted). Chapter

---

[12] The Walgreen's Defendants were silent as to the Chapter 93A issue in their briefing, therefore, the Court presumes that it adopts the Manufacturing Defendants arguments as noted in their Memorandum. [ECF No. 73 at 1 n.1].

93A defines "an unfair and deceptive act or practice" to include "fail[ure] to perform or fulfill any promises or obligation arising under a warranty." South Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc., 183 F. Supp. 3d 197, 219 (D. Mass. 2016) (quoting 940 C.M.R. 3.08(2)). The SJC has held that when an implied warranty claim and a Chapter 93A claim are based on the same "theory of injury and the same set of alleged facts, they should survive or fail under the same analysis." Iannacchino v. Ford Motor Co., 888 N.E.2d 879, 889 (Mass. 2008) ("in view of the interconnected nature of the plaintiffs' c. 93A and breach of implied warranty claims," the reasons that support the outcome of the Chapter 93A claim also warrant the same outcome for the breach of implied warranty claim). As a general rule, "a breach of warranty constitutes a violation of [Chapter 93A]." Maillet v. ATF-Davidson Co., 552 N.E.2d 95, 100 (Mass. 1990).

Additionally, it appears from the face of the complaint that Plaintiff followed the procedural requirements for filing Chapter 93A claims. [Am. Compl. ¶¶ 206–09; 301–04, 336–39, 462–66]. Accordingly, the Court will not dismiss the Chapter 93A claim at this time. Consequently, Plaintiff may pursue a Chapter 93A claim as to the implied warranty of merchantability only, because the Court has dismissed the claims for implied warranty of fitness for a particular purpose. [See supra III. F.].

Therefore, the motions to dismiss Plaintiff's Chapter 93A claim are **DENIED IN PART** and **GRANTED IN PART**. [ECF Nos. 72, 74].

### H.  Counts XXV- XXX against Walgreens of Massachusetts, LLC

Pursuant to the Court's consideration for the Plaintiff's Motion to Remand, Walgreens of Massachusetts, LLC (hereinafter, "Walgreens Massachusetts") noted in its opposition that annual reports from the Secretary of State's website indicate that Walgreens Massachusetts, was "formed for liquor licenses'" and therefore, Walgreens Massachusetts does not "engage in the business of

running Walgreens stores throughout Massachusetts," as argued by Plaintiff in her Motion for Remand briefing. [ECF No. 39 at 3, 3 n.1].[13,14] The Defendants also attached an affidavit from Cherita Thomas, the Assistant Company Secretary, which stated that Walgreens Massachusetts's "principal activity is to hold five liquor licenses for Walgreens in Massachusetts," that the LLC "never designed, manufactured, or distributed" the OCC chip, and the LLC "does not employ (and has never employed) any personnel that worked at" the Walgreens store at issue in this case. [ECF No. 39-1 ¶¶ 5–8]. The Defendant asks the Court to refer to the previous briefing, in addition to its memorandum for its Motion to Dismiss and dismiss all counts against Walgreens Massachusetts. [ECF No. 73 at 20 ("Walgreens of Massachusetts, LLC was established to hold liquor licenses on behalf of its parent company . . . [and] it has no involvement in the direct operation of the Walgreens store at issue in this case."); ECF No. 39-2 at 2–25]. Whether the Defendant Walgreens Massachusetts operates any control over the Walgreens store at issue is central to the Plaintiffs' claims. Watterson, 987 F.2d at 3–4. Additionally, the parties do not dispute the authenticity of the documents from the Massachusetts Secretary of State. Id. Courts "may take judicial notice of facts which are capable of being determined by an assuredly accurate source." Does 1-6 v. Mills, 16 F.4th 20, 26 n.3 (1st Cir. 2021) (quotation marks omitted). Defendants appended an exhibit of annual reports from 2018 to 2024, from the website of the Secretary of the Commonwealth of Massachusetts to their opposition brief, which courts in this District consider to be, "an assuredly accurate source." Miller v. Siemens Med. Sol. USA, Inc., No. 1:24-cv-12854-JEK, 2025 WL 2625269, at *4 n.2 (D. Mass. Sept. 11, 2025) (citing cf. Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of government website)); [See ECF No. 39-2].

---

[13] The Court notes that the Walgreens Defendants joined the Manufacturing Defendants' opposition brief, adding additional arguments in their separate pleadings. [ECF No. 40].

[14] The issue of Walgreens Massachusetts' citizenship was later stipulated at oral argument. [H'rg Tr. 16:25–17:6].

Therefore, the Court may consider such documents in its review of the pending Motions to Dismiss.

Notably, Plaintiff did oppose the inclusion of Thomas' Affidavit in her reply to the Motion to Remand, arguing several evidentiary theories as to why the Court could not accept the affidavit to prove the LLC's citizenship. [ECF No. 41 at 14–15]. However, Plaintiff is silent as to any argument about Walgreens Massachusetts' operation in her reply in the motion to remand, and in her opposition briefing for the motion to dismiss. [See ECF Nos. 41, 77]. Walgreens Massachusetts raised on two occasions an argument that the LLC's existence was exclusively for obtaining liquor licenses in Massachusetts and did not operate control over Walgreens locations within the state, or the specific location at issue in this case. [ECF No. 39 at 3 n.1; ECF No. 39-1 ¶¶ 5–8; ECF No. 73 at 20]. Plaintiff has failed on two occasions to counter, or even address, the issue of ownership and control for Walgreens Massachusetts and how the entity would impact the choice of OCC chip sales to John Doe I in this action, therefore, the Court deems these arguments waived. Mahoney, 342 F. Supp. 3d at 217; Perkins, 969 F.Supp.2d at 177. If Walgreens Massachusetts has no control over, or relation to, the sales of the location operating in Worcester, then it cannot have a legal duty to the decedent, nor can it be found to operate as a final seller for the pending warranty claims in this action.

Therefore, the Motions to Dismiss as to Counts XXV-XXX, [ECF No. 72, 74], against Walgreens of Massachusetts, LLC are hereby **GRANTED**.

## IV.   **CONCLUSION**

For the reasons stated above, the Motions to Dismiss, ECF Nos. 72, 74, are **DENIED IN PART** and **GRANTED IN PART**.

**SO ORDERED.**

Dated: March 31, 2026

      /s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge